## J. S. Judge & Co. v. Lilley et al.

*Samuel Phillips Lavine*, for plaintiff.

*Alexander Conn* and *John F. E. Hippel*, of *Edmonds, Obermayer & Rebmann*, for defendants.

GLASS, J., January 12, 1937. — Plaintiff brings this action in trespass against defendants for damages in the sum of $893.67, with interest thereon from July 11, 1935, representing damages sustained by it because of the loss or theft from it of certain mortgage bonds which had been purchased by defendants.

An agreed statement of facts was presented at the trial, which were as follows: Plaintiff is a corporation duly incorporated under the laws of the State of New York and is engaged in the business of buying and selling bonds and other forms of securities. Defendants were, on or about July 10, 1931, copartners doing business in the City of Philadelphia under the partnership name of Lilley, Blizzard & Company. The Erie Railways Company, a corporation formed under the laws of the State of Pennsylvania, on October 24, 1924, and thereafter, regularly executed and delivered at its home office in Erie, Pa., a number of six percent coupon first mortgage bonds, three of which are hereinafter more particularly referred to and are the three bonds in question in this case. On and prior to July 8, 1931, plaintiff herein was the owner and holder of the following of the said coupon bonds of the said Erie Railways Company, to wit, (a) Erie Railways Company six percent coupon bond bearing serial number M278, due 1954, $1,000; (b) Erie Railways Company six percent coupon bond bearing serial number D9, due 1954, $500; (c) Erie Railways Company six percent coupon bond bearing serial number D8, due 1954, $500.

On July 8, 1931, the said bonds were lost or stolen from the possession of plaintiff's employes in the Borough of Manhattan, New York City. On July 8, 1931, plaintiff caused to be flashed over the New York Stock Exchange tickers notice of the theft or loss of the said Erie bonds. Defendants, however, never knew of the flashing of the notices over the New York Stock Exchange tickers, nor had any other kind of notice. On or about July 10, 1931, defendants purchased two of the Erie bonds, M278 and D8, and thereafter, on or about July 13, 1931, purchased the third bond. When the bonds were purchased by defendants the number of each bond had been altered. All of the said Erie bonds were, without knowledge or authority of plaintiff, sold by defendants on or about July 11, 1931, to a Mr. C. R. Wilcox. At the time defendants

sold the bonds the aggregate value thereof with accrued interest was $893.67, the face value being $2,000.

The following is a copy of the bond:

"UNITED STATES OF AMERICA

"Commonwealth of Pennsylvania

"No.                    E. R. C.                    No.

"ERIE RAILWAYS COMPANY

"FIRST AND REFUNDING MORTGAGE SINKING FUND 6% THIRTY-YEAR GOLD BOND

"Due October 1, 1954.

"Erie Railways Company, a corporation, organized and existing under the laws of the Commonwealth of Pennsylvania (hereinafter termed the Company) for value received, promises to pay to bearer, or, if registered, to the registered holder of this bond, on the first day of October, 1954, one thousand dollars in gold coin of the United States of America of or equal to the standard of weight and fineness existing on the first day of October, 1924, at the principal office of the Equitable Trust Company of New York, in the Borough of Manhattan, City of New York, New York, and to pay interest thereon from the first day of October, 1924, at the rate of six percent per annum in like gold coin semi-annually, on the first day of April and the first day of October in each year, at the principal office of the Equitable Trust Company of New York, in the Borough of Manhattan, City of New York, New York, upon presentation or surrender of the interest coupon therefor as they severally mature, and until payment of said principal sum. Both the principal of and the interest on this bond are payable without deduction for any tax or taxes or other governmental charge (except succession or inheritance taxes, State income tax, and such portion of Federal income tax as shall be in excess of two per cent. per annum) which the Company, its successors or assigns, or any officer or fiscal agent thereof, or the Trustee under the mortgage hereinafter mentioned, may be required or permitted to pay thereunder to retain or to

deduct therefrom under any present or future law of the United States of America, or of any state, county, municipality or other having authority therein, whether any such tax be considered a personal tax on the holder of this bond or otherwise, all of which taxes except as aforesaid the Company covenants and agrees to pay. This bond is one of an authorized issue of bonds aggregating Five Million Dollars ($5,000,000) in principal amount known as the First and Refunding Mortgage Sinking Fund 6% Thirty-year Gold Bonds of the Company. All of said bonds are equally and ratably secured by an indenture of mortgage or deed of trust therein termed the mortgage dated as of the first day of October, 1924, duly executed and delivered by the Erie Railways Company to The Equitable Trust Company of New York as trustee to which mortgage reference is hereby made for a description of the property mortgaged and pledged, the nature and the extent of the security, the rights of the bondholders to such security, and the terms and conditions upon which said bonds are issued and secured. The Bonds and any thereof at the option of the Company or by expiration of the sinking fund hereinafter referred to are subject to redemption as provided in the mortgage at any time on or after October 1st, 1929, and from time to time prior to maturity upon advertisement in a newspaper published in the Borough of Manhattan, City of New York, New York, and the City of Erie, Pennsylvania, respectively, of notice of such redemption not less than thirty nor more than sixty days prior to the redemption date, and upon payment of the redemption price at that time required to be paid as below set forth, together with accrued interest on the principal amount of the bonds called for redemption to the date of redemption. As provided in the mortgage, on and after October 1, 1929, to and including October 1, 1934, the bonds or any of them may be redeemed at one hundred and five (105) per cent of the principal amount thereof, thereafter, to and including October 1, 1939, at one hundred and four (104) per cent thereof; thereafter,

to and including October 1, 1944 at one hundred and three (103) per cent thereof; thereafter, to and including October 1, 1949, at one hundred and two (102) per cent thereof; thereafter and prior to maturity at one hundred and one (101) per cent thereof. The bonds are entitled to the security and benefits of the Sinking Fund as provided in the mortgage. The Trustee named in the mortgage will apply sinking fund moneys at the option of the Company as provided in the mortgage to the purchase of bonds at not exceeding the redemption price current at the time, or to their redemption at call at such redemption price. Unless registered, as herein provided, this bond shall pass by delivery. This bond may be registered as to the principal sum in the holder's name at the registry to be maintained by the company at the principal office of the Equitable Trust Company of New York, in the Borough of Manhattan, City of New York, New York, such registration being noted hereon by the bond registrar of the company, after which no transfer shall be valid unless made at the registry by the registered holder in person, or by attorney, and similarly noted hereon; but this bond may be discharged from registration by the transfer to bearer similarly noted hereon, whereupon transferability by delivery shall be restored. Such registration, however, shall not affect the negotiability of the coupons for the interest on this bond, and such coupons shall continue to be payable to bearer, and to be transferable by delivery merely. The bonds are issued in denominations of One Thousand Dollars ($1000) and Five Hundred Dollars ($500). At the option of the holder, but at his cost and expense, as provided in the mortgage, a bond or bonds of one denomination, may be exchanged for a bond or bonds of the other denomination of the aggregate principal amount. In case an event of default as defined in the mortgage shall occur, the principal of the bond may become or be declared due and payable in the manner and with the effect provided in the mortgage, notwithstanding anything to the contrary contained in the bond. No re-

course shall be had for the payment of the principal of or interest on the bond, or for the enforcement of any covenant in the bond, or in said mortgage contained against any past, present or future incorporator, stockholder, director or officer of the company, or of any successor corporation, either directly or through the company, by the enforcement of any assessment, or by any legal or equitable proceeding, or by virtue of any statute, constitution or otherwise howsoever, and any and all personal liability of said incorporator, stockholder, director and officer in respect to this bond is, by the acceptance and a part of the consideration for the issuance hereof, expressly waived and released by every holder hereof. Neither this bond nor any coupon for interest hereto attached shall be valid or become obligatory for any purpose until this bond shall have been authenticated by the certificate endorsed hereon, duly signed by the Trustee or a successor in the trust under said mortgage.

"In witness whereof, Erie Railways Company has caused this bond to be executed by its president, or a vice-president, and its corporate seal to be hereunto affixed and attested by its secretary, or an assistant secretary, and coupons for interest bearing the fac-simile signature of its treasurer, to be attached hereto, as of the first day of October, 1924.

"Erie Railways Company

"By .................

"President.

"Attest .................

"Secretary."

These bonds were purchased by defendants from responsible, well-known stock exchange houses and dealers in securities in New York City for the then market price as a consideration and were sold without any actual or constructive notice and in the most absolute good faith to Wilcox, an agent of the issuing company, the Erie Railways Company. The profit realized by defendants in their sale was $20. When the bonds were purchased in the open

market, and when they were sold by defendants, they bore the altered numbers, but there was no sign or indication that the numbers that they then bore were not the correct numbers. The face of the bonds, although altered, did not give any possible indication of any alteration. That could not have been ascertained by anyone.

The only question for determination is whether the bonds in question under the admitted facts are negotiable instruments to which title passed by delivery or not. The bonds are made payable in the State of New York. That being the place of performance, the law of that State therefore should govern in the determination of the question involved: 6 Fletcher Cyc. of Corp., §2702: "In determining whether bonds are negotiable, the law of the place where the bonds are payable usually governs."

To the same effect is the quotation in 2 Beale on Conflict of Laws 1186:

"Probably because the place of payment usually appears on the face of such instruments while the place of contracting often does not, and because of the importance of having the negotiability of mercantile instruments easily and certainly determined in order to promote their marketability and usefulness . . . most of the cases where the places of making and performance apply the law of the place of performance to determine negotiability, either do so simply because it is the place of performance, or in accordance with the presumed intent of the parties."

See also Paepcke v. Paine, 253 Mich. 636, citing Fidelity & Deposit Co. v. Andrews, 244 Mich. 159; City Bank & Trust Co. v. Atwood, 197 Mich. 116.

In order to determine the negotiability or the nonnegotiability of the bonds in question, it is necessary to make reference to the applicable provisions of the Negotiable Instruments Law of the State of New York, which are found in chapter 38, sec. 20, of the Consolidated Laws of New York.

"An instrument to be negotiable must conform to the following requirements:

"(1)  It must be in writing and signed by the maker or drawer;

"(2)  Must contain an unconditional promise or order to pay a sum certain in money;

"(3)  Must be payable on demand, or at a fixed or determinable future time;

"(4)  Must be payable to order or to bearer;  and

"(5)  Where the instrument is addressed to a drawee, he must be named or otherwise indicated therein with reasonable certainty."

Note:  This section with its subdivisions is similar to section 1 of the Negotiable Instruments Law of Pennsylvania of May 16, 1901, P. L. 194.

Section 22 provides:

"An unqualified order or promise to pay is unconditional within the meaning of this chapter, though coupled with:

"(1)  An indication of a particular fund out of which reimbursement is to be made, or a particular account to be debited with the amount;  or

"(2)  A statement of the transaction which gives rise to the instrument.  But an order or promise to pay out of a particular fund is not unconditional."

Note:  This section with its subdivisions is similar to section 3 of the Negotiable Instruments Law of Pennsylvania of May 16, 1901, supra.

Section 23 provides:

"An instrument is payable at a determinable future time, within the meaning of this chapter, which is expressed to be payable:

"(1)  At a fixed period after date or sight;  or

"(2)  On or before a fixed or determinable future time specified therein;  or

"(3)  On or at a fixed period after the occurrence of a specified event, which is certain to happen, though the time of happening be uncertain.

"An instrument payable upon a contingency is not negotiable, and the happening of the event does not cure the defect."

Note: This section with its subdivisions is similar to section 4 of the Negotiable Instruments Law of Pennsylvania, supra.

Section 24 provides:

"An instrument which contains an order or promise to do any act in addition to the payment of money is not negotiable. But the negotiable character of an instrument otherwise negotiable is not affected by a provision which:

"(1) Authorizes the sale of collateral securities in case the instrument be not paid at maturity; or

"(2) Authorizes a confession of judgment if the instrument be not paid at maturity; or

"(3) Waives the benefit of any law intended for the advantage or protection of the obligor; or

"(4) Gives the holder an election to require something to be done in lieu of payment of money.

"But nothing in this section shall validate any provision or stipulation otherwise illegal."

Note: This section with its subdivisions is similar to section 5 of the Negotiable Instruments Law of Pennsylvania, supra.

Section 28 provides:

"The instrument is payable to bearer:

"(1) When it is expressed to be so payable; or . . ."

Note: This section with its subdivisions is similar to section 9 of the Negotiable Instruments Law of Pennsylvania, supra.

Section 90 provides:

"The holder of a negotiable instrument may sue thereon in his own name; and payment to him in due course discharges the instrument."

Note: This section with its subdivisions is similar to section 51 of the Negotiable Instruments Law of Pennsylvania, supra.

Section 91 provides:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"(1) That it is complete and regular upon its face;

"(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"(3) That he took it in good faith and for value;

"(4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Note: This section with its subdivisions is similar to section 52 of the Negotiable Instruments Law of Pennsylvania, supra.

While the act does not in express terms refer to bonds of corporations, it has been held by the courts of that State, in Brainerd v. New York & Harlem R. R. Co., 25 N. Y. 496, and courts generally that those bonds have the same attributes of commercial paper: See note in 31 A. L. R. 1390.

In this State, as early as the case of The County of Beaver v. Armstrong, 44 Pa. 63, it was held that the coupons of railroad bonds are negotiable instruments. In Mason v. Frick, 105 Pa. 162, it was held that coupon bonds payable to bearer lawfully issued and sold by a private corporation possess the incidents of negotiable paper and title thereto passes by delivery to a bona fide purchaser, unaffected by want of title. In that case Mr. Justice Mercur said, at page 167:

"It is held by the supreme court of the United States and by the courts of our sister states that the bond of a corporation of this form and character is negotiable. . . . The bond of a railroad company to secure the payment of money, although under seal, when made payable to bearer or to order, is regarded as invested with all the attributes of negotiable paper: Zabriskie v. Cleveland C. & C. R. R. Co., 23 Id., 381; Winfield v. Hudson, 28 N. J. L., 255; Murray v. Lardner, 2 Wall, 120; Morris Canal Co. v. Lewis, 12 N. J. Eq., 323."

At page 169 he says:

"We adopt the conclusion that a bond of the form of the one now in question, must now be held in Pennsylvania, as elsewhere, to possess the incidents of negotiable paper. The defendant having taken this bond in good faith, and having paid a valuable consideration therefor, acquired a good title: Phelan v. Moss, 17 P. F. Smith, 59; McSparran v. Neeley, 10 Norris, 17."

In Cochran v. Fox Chase Bank, 209 Pa. 34, the court says (p. 38):

". . . such bonds are negotiable and that the title passes by delivery" . . . .

To the same effect is Dengler v. Paul et al., 83 Pa. Superior Ct. 37.

We then pass to the question: Is there anything in the bond which destroys its negotiable character? The instrument itself determines its character. Of course, it must conform to the requirements of the Negotiable Instruments Law in order to be considered negotiable. The statute deals with its form and with what an inspection of its face discloses. In the instant case, the inspection of the bond discloses that it is intended for the purpose of being circulated. At this juncture it might be well to quote the language of Justice, now Chief Justice, Kephart in the case of International Finance Corp. v. Philadelphia Wholesale Drug Co., 312 Pa. 280, 283:

"It is well to restate some of the fundamental principles that underlie the law of negotiable instruments. Negotiable instruments are the chief medium of credit. As such their inviolability must be made as secure as possible. They must pass freely in the channels of commerce without embarrassment to their handlers though extrinsic matters unaffecting their integrity appear thereon. If any impediment arises in their course, it must spring from the instrument itself, and the danger signal must be so clear and certain that none may miss it. When doubt or uncertainty arises, it is resolved in favor of negotiability. Whenever an instrument shows on its face that it

embraces all the elements of a negotiable one, its negotiability is presumed. No extrinsic evidence may be considered to show nonnegotiability: Perth Amboy Trust Co. v. Modern School Assn., 154 Atl. 418 (N. J., 1931); International Finance Corp. v. Northwestern Drug Co., 282 Fed. 920. The paper travels as 'a courier without luggage' until this presumptive freedom of transferability is clearly and definitely restrained by its own evident limitations: mere words of ambiguity will not restrain its course. There must appear on its face clear, certain and manifest notice of its conditional character. In such perilous times as now confront us, we are called upon to be particularly careful lest, in seeking to prevent the consummation of a fraud, we do great harm to business generally, for the greater the shrinkage in commerce the more certainly is the freedom of negotiable instruments required as a stimulus to commerce."

With the principles of interpretation and policy as thus enunciated as our guide, we approach the case now in hand. We believe and we conclude that the well-reasoned decisions in other jurisdictions support our view that the negotiable character of the bonds in question was not affected by any provisions contained in the bond. In Enoch v. Brandon et al., 249 N. Y. 263 (1928), the question before the court was whether the bonds were negotiable. The bonds made reference to a trust mortgage, possible acceleration of due date, privilege of redemption, and requirement that a sinking fund be created. It was held that the negotiability of the bonds was not affected thereby. The court there said at pages 266-270:

"The statute deals with the form of the instrument— with what a mere inspection of its face should disclose. It must contain an unconditional promise to pay a fixed sum, on demand, or at a fixed or determinable future time, to order or to bearer. Only if it fulfills these requirements is it negotiable. If it does, no collateral agreement affects its character. . . .

"Provisions other than those required by section 20 may be contained in a bond or note without impairing its negotiability. There may be included, among other things, a statement of the transaction giving rise to the instrument (sec. 22) or a statement as to collateral security (sec. 24.) And it may refer to a trust mortgage, or to an agreement as to the collateral which fixes the remedies of the parties with respect thereto. *(Chelsea Bank* v. *Warner*, 202 App. Div. 499).

. . . . . . . . .

"Three cases in this State will serve as an illustration. In *McClelland* v. *Norfolk Southern R. R. Co.* (110 N. Y. 469) the bond itself showed that the promise to pay was a conditional one. It was to become payable upon the terms and with the effect mentioned in the trust mortgage. In *Hibbs* v. *Brown* (190 N. Y. 167) the precise form of the bond involved does not appear in the printed case and exceptions. It did, however, contain a clause referring 'to the deed of trust for a statement of the rights of the bond-holders and of the securities and property securing the payment of the bonds,' and we said that this clause had only to do with procedure under the trust indenture. In *Old Colony Trust Company* v. *Stumpel* (247 N. Y. 538) the note stated that it was 'subject to the terms' of a conditional sales agreement. Here by no possibility did the clause relate to security. Necessarily it had to do with the terms of payment.

"Do then the references in these particular bonds to the trust mortgage modify the promise to pay; do they subject it to some possible condition or contingency described elsewhere, or do they merely determine the rights and remedies of the holder under the mortgage? We must consider the instrument as a whole, not wresting any one phrase from its context and concentrating our attention upon it alone. Further, where the meaning is doubtful, we must adopt the construction most favorable to the bondholder.

"The bonds are part of an issue of $7,500,000, 'all equally secured by and entitled to the benefits and subject to the provisions' of the trust mortgage. Then, speaking of possible redemption, of acceleration of payment, of a sinking fund and of notice, it continues 'all as provided' in the trust mortgage 'to which reference is hereby made for a description of the property mortgaged and pledged, the nature and extent of the security, the rights of the holders of the bonds with respect thereto, the manner in which notice may be given to such holders, and the terms and conditions under which said bonds are issued and secured.'

"We hold that here there is no modification of the promise to pay, made in explicit terms. The provisions all have to do with the trust mortgage. They refer to the rights conferred by it upon the bondholders and limit and explain those rights. They are so linked together as to indicate that the obligor was speaking solely of the security. A purchaser scanning the bonds would have the same thought. It would never occur to him that when November 1, 1941, arrived, because of something contained in the mortgage he might be unable to collect the amount due him. . . . Again it would mean to him as it means to us, that only by turning to the mortgage might he discover the precise nature of the lien he is to obtain. He would see that the bonds were to be issued not only upon the general credit of the corporation, but upon the faith of some collateral mortgage. To it he must go if further knowledge as to this security is desired. . . .

"There is the possibility of the acceleration of the date when the bonds are due if there is default under the mortgage. . . . (*Higgins* v. *Hocking Valley Ry. Co.*, 188 App. Div. 684; *Chicago Railway Equipment Company* v. *Merchants' Bank*, 136 U. S. 268, 284; *Mackintosh* v. *Gibbs*, 81 N. J. L. 577; *Schmidt* v. *Pegg*, 172 Mich. 159; *White* v. *Hatcher*, 135 Tenn. 609.) A note is payable at a determinable future time if payable on or before a fixed date. (Sec. 23.) And in one case acceleration of payment in

case of default is expressly recognized. (Sec. 21.) The same thing is true of the privilege given the obligor to redeem at 105 per cent before the bonds became due. That does not limit its absolute promise to pay on November 1, 1941. The bonds are payable to bearer or if registered to the registered holder. This does not affect their negotiability. (*Dickerman* v. *Northern Trust Company*, 176 U. S. 181.) Nor does the provision requiring the obligor to create a sinking fund."

We have quoted from this case at length because it is quoted with approval in other jurisdictions.

In Pflueger v. The Broadway Trust & Savings Bank, 351 Ill. 170, wherein an action of replevin was instituted for the recovery of three $1,000 debenture bonds, defendant pleaded specially that the bonds were payable to bearer and negotiable; that they were negotiable before maturity, and that defendant in error took them without any knowledge of defect of title and became the holder thereof in due course; judgment for possession was rendered in favor of plaintiff in error, but reversed by the appellate court with a finding of fact that the rights of property and possession were in defendant in error and that the debentures were negotiable instruments. The court said at pages 174, 176, and 179:

"The principal question involved, is, were the debentures negotiable instruments? . . .

"A recital in a promissory note or bond, or a reference in it to some other instrument, in order to destroy its negotiability must be of such a nature that the recital in the bond or the reference to the other instrument qualifies or makes uncertain or conditional the promise to pay. (*People* v. *Gould*, 347 Ill. 298; *Zollman* v. *Jackson Trust and Savings Bank*, 238 id. 290; *Chicago Trust and Savings Bank* v. *Chicago Title and Trust Co.*, 190 id. 404.) If the note or bond merely recites that it is part of a certain agreement which does not affect the promise to pay, it is negotiable. (*Utah Land Irrigation Co.* v. *Allen*, 64 Utah, 511, 231 Pac. 118.) Whether a written instrument

is negotiable must be determined from the writing itself. Its negotiability cannot depend upon extrinsic evidence. (*Equitable Trust Co.* v. *Harger*, 258 Ill. 615.) In *Enoch* v. *Brandon*, 249 N. Y. 263, the New York Court of Appeals said: '. . . Reference to the paper itself said to be negotiable determines its character. . . . Further, where the meaning is doubtful we must adopt the construction most favorable to the bondholder.' . . .

"If a prospective purchaser wanted to buy these debentures, he would, upon reading them, first find an unconditional promise to pay a sum certain of money to bearer at a fixed future time. The quoted reference to the trust agreement . . . does not affect this unconditional promise to pay but only means that the holder is referred to the trust agreement for his rights under the agreement. . . .

"In the present case the vesting in the debentures of the right of action in the trustee was a remedy for collection after the debentures became due, and therefore after they ceased to be negotiable. Their negotiability was therefore unaffected."

This case was followed in the case of The Sturgis National Bank v. The Harris Trust & Savings Bank, 351 Ill. 465. There the court said at page 467:

"This case is governed by the same rules of law which controlled the decision of *Pflueger* v. *Broadway Trust and Savings Bank*, (*ante* p. 170.) "

At page 471 the court said:

"The negotiability of an instrument must be determined from the writing itself. It cannot depend upon extrinsic evidence. (*Equitable Trust Co.* v. *Harger*, 258 Ill. 615; *King Cattle Co.* v. *Joseph*, 158 Minn. 481; *Old Colony Trust Co.* v. *Stumpel*, 247 N. Y. 538; *Enoch* v. *Brandon*, 249 id. 263; *Paepcke* v. *Paine*, 253 Mich. 636.) The reference to another writing which will destroy the negotiability of an instrument, otherwise negotiable, must be of a kind which in some respect qualifies or makes uncertain or conditional the promise. [citing cases.]

Reference in a bond, note or other obligation for the payment of money, otherwise negotiable, to the fact that it is secured by a mortgage or trust deed or by the deposit of collateral securities; [citing cases] or that the consideration for it is a promise to pay money for services to be rendered in the future; [citing case] or to advance money in the future; [citing case] or is the purchase of personal property to be paid for by a series of notes maturing on certain fixed dates, all to become due on the failure of the maker to pay any one of the notes, the title of the property to remain in the payee, the vendor, until all the notes are paid, all of the notes being equally and ratably secured on the property; [citing case] or is a contract whose terms are not mentioned; *(Nat. Bank of Newbery* v. *Wentworth,* 218 Mass. 30; *Taylor* v. *Curry,* 109 Mass. 36;) or that it is issued as one of a series of like obligations, all of which are equally secured by a mortgage or trust deed or other collateral agreement, and that each is equally entitled to the privileges and subject to the provisions of the trust deed; (*Pflueger* v. *Broadway Trust and Savings Bank,* supra; *Page* v. *Ford,* 65 Ore. 450; *Thorpe* v. *Mindeman,* 123 Wis. 149; *Enoch* v. *Brandon,* supra; *Hibbs* v. *Brown,* 190 N. Y. 167;) does not affect the negotiability of the instrument containing the reference. In all such cases where the reference is general and no particular provision of the mortgage, trust deed or other agreement for collateral security is mentioned which modifies the unconditional promise to pay, the amount to be paid or the time when it is to be paid, the negotiability of the note is not affected. Such a reference does not make the instrument referred to, a part of the promise to pay or indicate an intention to impose any condition upon that promise. . . . The question is whether the terms of the reference are such as to lead to the inference that the instrument referred to contains a condition qualifying the absolute promise to pay or the amount or time of such payment."

20

In the case of Paepcke v. Paine, 253 Mich. 636, the bonds were of the same series as in the Pflueger v. Broadway Trust Company case. In that case the court adopted the rule announced in the New York and Illinois cases as being the better rule. The court said, at page 643:

"Negotiable paper is frequently used as a substitute for money, and the essential elements of negotiability are the certainty in the sum to be paid and in the time of payment. If the instrument on its face contains language creating uncertainty in either of these respects, it fails to meet the statutory requirements.

"The reference in the bond above quoted does not assume to in any way affect the unconditional promise to pay. A purchaser is referred to the trust agreement for a statement of the rights and obligations of the company, the trustee, and the holders of the bonds 'under the said trust agreement.' It in no way refers to or qualifies the unconditional promise of the company to pay the bond at maturity theretofore clearly expressed. The reference gives notice to the bondholder that he may examine the trust agreement to ascertain the nature and kind of the security pledged to insure payment and the procedure provided for to enforce the same, should he care to do so before making purchase thereof. But it in no way imposes that duty upon him in order to determine the status of the bond as a negotiable instrument."

The court then cited with approval Enoch v. Brandon et al., supra. See also Siebenhauer v. Bank of California National Assn. et al., 211 Cal. 239, and also Bank of California v. National City Co., 138 Wash. 517, 522. In that case the court said:

"In *Bright v. Offield*, 81 Wash. 442, 143 Pac. 159, Judge Ellis, speaking for the court, said:

" 'According to what we believe to be the better rule, a mortgage securing a note, though referred to in the note but without expressly adopting its conditions, is merely ancillary to the note, and the conditions found in the mortgage alone will not change the character of the note as a

negotiable instrument. The promise to pay is held to be a distinct agreement from the mortgage, and if couched in proper terms, the note is negotiable. *Thorp v. Mindeman*, 123 Wis. 149, 101 N. W. 417, 107 Am. St. 1003, 68 L. R. A. 146.' "

Since defendants purchased these bonds in good faith, for value, before maturity, they became the holders of them in due course; and the bonds being negotiable, title passed and defendants acquired good title to them, although plaintiffs either lost them or lost possession of them by theft: Mason v. Frick, supra; Cochran v. Fox Chase Bank, supra, and the other cases already referred to.

Viewing this case in the light of the negotiable instruments statutes both of the State of New York and our own State, of the decisions to which reference has already been made, and in the spirit of the law merchant, we conclude, as we have already indicated, that the bonds in question were negotiable and passed by delivery, and that defendants, being purchasers of them in good faith and for value before maturity, without any notice of any defects therein, either actual or constructive (there being no evidence of any negligence on their part), had good title to the said bonds. We accordingly find in favor of defendants.